UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROSEANN DICKSON,

                Plaintiff,

v.

STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, et al.,

                Defendants.

CASE NO. C10-5375 BHS

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants State of Washington Department of Social and Health Services and Western State Hospital's (collectively "Western") motion for summary judgment (Dkt. 26). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

**I. PROCEDURAL HISTORY**

On May 25, 2010, Plaintiff Roseann Dickson ("Dickson") filed a complaint against Western and five John and Jane Does alleging violations of Title VII of the Civil

ORDER - 1

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. Dkt. 1.

On May 31, 2012, Western filed a motion for summary judgment. Dkt. 26. On June 21, 2012, Dickson responded. Dkt. 40. On June 29, 2012, Western replied and included a motion to strike the declarations submitted with Dickson's response.[1] Dkt. 41.

## II. FACTUAL BACKGROUND

**A.     The Hospital and Dickson's First Position**

Western is a state-owned psychiatric hospital for adults. Dkt. 34, Declaration of Dale Thompson, ¶ 2. The hospital provides evaluation and inpatient treatment for individuals with serious or long-term mental illness and also serves individuals who have been committed as a result of a criminal proceeding. *Id*. The hospital houses approximately 800 patients and employs approximately 2,000 employees. *Id*.

In 2001, the Hospital hired Dickson as an Institutional Counselor 2. Dkt. 35, Declaration of Peggy Nelson, ¶ 3. From the time Ms. Dickson was hired through the time she was transferred to Western's mailroom in 2006, Western received a large volume of complaints from her coworkers and supervisors. *Id*., Exhs. A–V, X–Y, & AA–BB. These complaints included Dickson manipulating duties so others would perform tasks for her, refusing to do aspects of her job she did not like, ignoring people, being rude, undermining her coworkers' rapport with patients, and being hostile and

---

[1] The Court has reviewed the motion and the declarations and agrees with Western that the declarations contain very little admissible evidence. Instead of granting the motion, the Court will set forth the admissible evidence that it relies upon in rendering this decision.

confrontational during disagreements. *Id.* Some of the employee complaints provided that the employee was being subjected to a "hostile work environment" by Dickson. *Id.*, Exhs. B & Y. One of Dickson's supervisors completed an evaluation that provides in part as follows:

> Ms. Dickson has not been a model employee and/or co-worker since her arrival on the ward. Her personal and legal issues have occupied the bulk of her ward activities. She had utilized threats with her co-work[er]s of including them as part of her legal issues with the State of Washington. These actions have occupied her time at work to such an extent that it has been made aware by other sources of her preoccupation to her lawsuit issues with the state.[8] This in part is one of the reasons she does not follow the directions of those above her nor that [she] is compelled to correct such deficiencies as they are pointed our to her. Her work performance has suffered. When her co-workers have requested her to be part of the ward staff and complete the assignments for the betterment of patient care, she only wishes to perform the interaction portions and not the other manual required tasks to effectively and efficiently keep the ward running smoothly. Her well document[ed] responses of the lawsuit have effective[ly] alienated her co-workers. It has brought the ward morale down and has affected []unit productivity to the point of where it is now spreading to the other wards of this unit. … It was … brought to her attention of the hostile work environment she is continuing to breed by her unrelenting actions and behaviors.

*Id.*, Exh. BB.

**B.     Transfer to the Mailroom**

Ultimately, one of Dickson's coworkers sued Western based on allegations that he suffered harassment by Dickson. *Id.*, ¶ 10. In 2005, Western conducted an investigation into complaints about Ms. Dickson and concluded the following:

> On February 12, 2003 [Dickson] made several racially derogatory comments to staff member Brian McElroy to include: "You ain't nothing nigger," "I thought you were better than the rest of those niggers," and "you just like all those niggers." Alex Bullock, a co-worker, recalls on one occasion hearing [Dickson] make racial comments to Mr. McElroy where

> [Ms. Dickson] said: "I'm gonna get you nigger" and "I'm going to get you fired." Mr. Bullock described [Dickson] as yelling these comments in a loud voice.
> On July 9, 2004, when Mr. McElroy was on his way to the Administration building to pick up his paycheck [Dickson] instructed a co-worker "Don't talk to this Black bitch," "don't have anything to do with him (Brian McElroy)". After Mr. McElroy picked up his paycheck from the payroll office and was on his way back to his car in the parking lot, [Dickson] yelled at him saying "You Black nigger, you bitch mother fucker, you ain't about shit."
> The investigation revealed that several other staff members viewed [Dickson] as being confrontational, aggressive (both verbally and physically), intimidating and threatening to them and to the patients. These staff members report that [Dickson] also made comments such as: "I'll play the race card," "better watch your back," or "I'll get you fired." It was also reported that [Dickson] intimidate[d] other staff members by deliberately moving into their personal space and trapping them in a patient's room by blocking the doorway.
> In addition, the U.S. Federal Equal Employment and Opportunity Commission (EEOC) investigated the allegations of racial harassment by [Dickson] toward Mr. McElroy and found that "he was continually subjected to a racially hostile environment based on his race . . . ."

*Id*., Exh. DD.  As a result, Western demoted Ms. Dickson to work as a Mail Processor in Western's mailroom effective June 2, 2006. *Id*.

**C.     The Mailroom**

Western's mailroom was supervised by Jack Baker, who managed both the print shop and the mailroom.  Dkt. 27, Declaration of Jack Baker ("Baker Decl."), ¶ 2. The mailroom had three permanent employees assigned to it during the time period relevant to this lawsuit – Ms. Dickson, lead worker Lenora Garrett, and Jason Millman.  *Id*., ¶ 4. The mailroom sorted, delivered, and collected mail for Western, and also operated a United States Postal Service substation, which sold stamps, money orders, and accepted packages and letters from patients and staff to be sent through the Postal Service.  *Id*., ¶ 2.

1    In July 2006, one co-worker complained that Dickson's "behavior created a hostile
2 work environment, she is intimidating, demeaning in her refusal to answer my questions
3 about the work that needs to be done and I believe I'm being harassed." *Id.*, Exh. A.
4 Other coworkers continued to submit complaints about Dickson throughout the next few
5 months. *Id.*, Exhs. B–E.
6    In October 2008, Western's Chief Operating Officer, Dale Thompson, directed Dr.
7 Bill Proctor to conduct an investigation into the complaints about Dickson. Dkt. 34,
8 Declaration of Dale Thompson ("Thompson Decl."), ¶¶ 3–4. These varied complaints
9 ranged from allegations that she had harassed Mr. Millman due to his disability to
10 allegations that she physically hit another employee with a door. Baker Decl., Exhs. A–
11 E. On November 10, 2008, Dr. Proctor concluded his investigation with a report.
12 Thompson Decl., Exh. A. The report raised red flags about Dickson's treatment of Mr.
13 Millman, including concerns that she was demeaning towards him due to his disability
14 and had improperly acted as if she were his supervisor, even though they both held the
15 same position. *Id.*
16    In light of this report, Mr. Thompson ordered a follow-up investigation by Julie
17 Poirier, the Program Director at Western for Habilitative Mental Health. *Id.*, ¶ 6. On
18 February 10, 2009, Ms. Priorier concluded her report and provided in part as follows:
19        Interviews conducted by this writer support Mr. Millman's
          assertions that he has been the victim of work place harassment by Ms.
20        Dickson. Interviews of key mailroom/publications staff support that Ms.
          Dickson engages in rude, demeaning interactions, ignores his direct
21        interactions, and works outside of her job class by checking his work and
          assigning him work tasks. Mr. Millman's assertion that Ms. Dickson
22

1  intentionally manipulates workloads so that Mr. Millman has the larger, more physically demanding workload is also supported.

2  This behavior meets the WSH 2.4.10 Workplace Violence policy definition for workplace violence which includes harassment of any kind.

3  In addition Ms Dickson's actions are also in violation of DSHS administrative policy 18.66 that governs discrimination and harassment

4  prevention and RCW 49.60 for work place discrimination.

5  Dkt. 33, Declaration of Julie Priorier, Exh. A.

6  **D.     Second Transfer**

7  On January 7, 2009, Dickson was temporarily transferred to Dietary to separate

8  her and Mr. Millman. Thompson Decl., ¶ 8. Dickson's title, seniority, schedule, and rate

9  of pay were not adversely affected by this temporary change. *Id.*

10  Due to severe budget cuts, Western decided to terminate its contract to operate the

11  postal substation in its mailroom. *Id.*, ¶ 12. The closure resulted in the elimination of

12  Mr. Millman's position and Dickson's position. Nelson Decl., ¶ 14. On March 23, 2009,

13  Western informed Dickson that her permanent position was being eliminated. Dkt. 32,

14  Declaration of Christopher Lanese ("Lanese Decl."), Exhs. A & C.

15  Soon thereafter, Dickson filed complaints of discrimination. *Id.*, Exh. D.; Dkt. 31,

16  Arturo Haro, Exh. A. Both Western's internal investigation and the Equal Employment

17  Opportunity Commission's ("EEOC") investigation concluded that there was no evidence

18  to support Dickson's allegations of discrimination. *Id.*, Exh. B; Lanese Decl., Exh. E.

19  Then, on February 22, 2010, the EEOC issued Dickson a right to sue letter. *Id.* This

20  lawsuit soon followed.

21

22

# III. DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     Western's Motion**

      **1.     42 U.S.C. §§ 1981, 1983**

Western requests that the Court dismiss Dickson's claims under 42 U.S.C. §§ 1981 and 1983.  Dkt. 26 at 13–14.  States, state agencies or individuals in their official capacity cannot be sued under 42 U.S.C. § 1981 or 42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (holding that neither the state nor its officials acting in their official capacity are "persons" under § 1983), *see Pittman v. Oregon*, 509 F.3d 1065, 1070–1074 (9th Cir. 2007) (stating that 42 U.S.C. § 1981 does not permit actions against the state or arms of the state.).

      In this case, Western argues that Dickson may not bring a claim against a state agency under either § 1981 or § 1983.  Dickson failed to respond to this argument, which the Court may consider an admission that Western's motion has merit.  Local Rule 7(b)(2).  The Court finds that Dickson may not assert a claim under either § 1981 or § 1983 against either state agency defendant.  Therefore, the Court dismisses Dicksons' § 1981 and § 1983 claims with prejudice.

### 2. Title VII

Diskson asserts claims under Title VII for race and gender discrimination, retaliation, and a hostile work environment. The Court will separately address each claim.

#### a. Race and Gender Discrimination

To make out a prima facie case of racial or gender discrimination on the basis of disparate treatment, Dickson must show that (1) she belonged to a protected class; (2) she was performing his job in a satisfactory manner; (3) she was subjected to an adverse employment action; and (4) similarly situated employees not in her protected class received more favorable treatment. *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 818 (9th Cir. 2002).

In this case, Dickson fails to establish a prima facie case of discrimination. The only adverse discrimination action was the elimination of her permanent position in the mailroom. However, Western only retained an employee that was also in Dickson's protected classes, an African-American female. Therefore, the Court grants Western's motion on this claim because Dickson has failed to show that a similarly situated employee not in her protected class was treated more favorably.

#### b. Retaliation

To make out a prima facie case of retaliation under Title VII, Dickson must demonstrate that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the

1  employment decision. *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185,
2  1196–97 (9th Cir. 2003).
3        In this case, Dickson fails to establish a prima facie case. Although Dickson
4  engaged in a protected activity in reporting alleged acts of discrimination and suffered an
5  adverse employment action by having her permanent position eliminated, she has failed
6  to establish a causal link between the two because she filed her reports *after* she was
7  informed that her position was being eliminated. Therefore, the Court grants Western's
8  motion on this claim.
9        **c.**    **Hostile Work Environment**
10        To prevail on a hostile workplace claim premised on either race or sex, Dickson
11  must show: (1) that she was subjected to verbal or physical conduct of a racial or sexual
12  nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently
13  severe or pervasive to alter the conditions of her employment and create an abusive work
14  environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).
15  "The working environment must both subjectively and objectively be perceived as
16  abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (internal
17  quotation marks and citation omitted).
18        In this case, Dickson has failed to submit evidence on each element of her claim.
19  The Court finds that there is no evidence in the record to create a material issue of fact
20  that Dickson's working environment was sufficiently severe or pervasive as to alter the
21  conditions of her employment. Dickson's unsupported allegations of sporadic insulting
22

1 comments do not establish an objectively abusive work environment. Therefore, the

2 Court grants Western's motion on this claim.

### IV. ORDER

Therefore, it is hereby

**ORDERED** that Western's motion for summary judgment (Dkt. 26) is **GRANTED**. The Clerk shall enter **JUDGMENT** for Western and the State of Washington. Dickson's remaining claims against John and Jane Does are **DISMISSED**.

Dated this 31st day of July, 2012.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 11